ROBERT ARMSTRONG, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. Where the defense of insanity is relied upon, the rule in force in this State is, that if the evidence introduced tends to rebut the presumption of sanity on the part of the accused, and the jury entertain a reasonable doubt, after due consideration of all the evidence, as to his sanity, it is their duty to acquit.

2. The statutory definition of murder, " the unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed," includes the element of a rational agency, and it devolves upon the State to show this as well as any other element of the crime. The law, however, presumes that all men are sane, and in the absence of evidence

indicating a contrary state of mind, both court and jury are justified in acting upon this presumption ; and where the evidence establishes the criminal act, and indicates nothing as to the mental capacity of the accused to commit the deed, a conviction is not only authorized, but should be had. If however, there arises from the evidence, coming from any quarter, a reasonable doubt as to the sanity of the accused, the presumption of the law is overcome and he is entitled to an acquittal, unless the State meets and overcomes this reasonable doubt arising in his favor.

3. Non-expert witnesses can not express a general opinion as to sanity nor can they give an opinion independent of the facts and circumstances within their own knowledge ; but they can detail the facts known to them which show insanity, and thereupon express an opinion as to the sanity of the person whose mental condition is being investigated. The value of such testimony will depend largely upon the opportunities of the witnesses for correct observation of the appearances and conduct of the person whose mind is claimed to be unsound, as well as the character of such appearances and conduct.

4. Where insanity of a permanent type, or of a continuing nature, or possessed of the characteristics of an habitual or confirmed disorder of the mind, as distinguished from temporary or spasmodic mania, or disorders of mind produced by the violence of disease, is shown to have existed a short time prior to the commission of an act, it is presumed to continue up to the time of the commission of the act, unless this presumption is overcome by competent testimony.

5. The verdict of a jury will not be set aside on evidence of facts complicated and contradictory and which require an investigation into the character and credit of witnesses whose testimony it is necessary to compare and weigh ; nor will the verdict be set aside as against the weight of the evidence unless it preponderates so strongly against the verdict that the court can not conclude such verdict was the result of a due consideration of the evidence ; but a verdict that is clearly against the evidence should be set aside. The evidence in this case considered and held not to sustain the verdict.

Writ of Error to the Circuit Court for Duval county.

*F. W. Pope* for Plaintiff in Error.

*The Attorney-General* for the State.

Mabry, J. :

Plaintiff in error, Robert Armstrong, was indicted in the Duval Circuit Court for the murder of Carleton Lowe, and has been twice tried and convicted in Duval county of the alleged offense. The first conviction occurred in May, A. D. 1890, and on writ of error to this court the judgment of the trial court was reversed and a new trial awarded. 27 Fla., 366, 9 South. Rep., 1. This reversal was upon the ground of misdirection of the jury by the court. In December, A. D. 1891, another trial resulted in a verdict of guilty, and a sentence of death, and by writ of error, the proceedings of the second trial are now before us for review. Before sentence was passed upon plaintiff in error he made a motion for a new trial on various grounds, the first three of which are, in substance, that the verdict was against the evidence, against the law, and against the charge of the court. The overruling of this motion is assigned as error in this court, and counsel for plaintiff in error contends that the evidence, all of which is presented to us by bill of exceptions, does not sustain the verdict. This necessitates

an examination and due consideration of the evidence on our part to see if this contention of counsel must be sustained.

The first witness who testified for the State was Paul G. Phillips, who stated that he was Chief of Police then and at the time Carleton Lowe was killed. He knew Carleton Lowe was dead; saw his dead body; he died February 26th, A. D. 1890, in Duval county, Florida. Witness saw the dead body for the first time at the undertaker's shop in the city of Jacksonville, February 27th, A. D. 1890. Witness examined the body and found three pistol or gun shot wounds, one where the ball struck the badge on the breast, another right below the left nipple, and one right across his forehead went diagonally across and took the skin and flesh to the bone. The ball below the left nipple went through and came out at his back below the shoulder blade. Witness identified a badge which was on deceased, and stated that one ball was imbedded in the badge, It was a policeman's badge, and is worn on the left breast.

Charles Caricio testified for the State that he first saw the accused the night of February 26th, A. D. 1890, at DeMoya's store, where witness clerked. The accused came in about fifteen minutes after nine o'clock at night and asked for a cigar. Witness gave him one, and he put his hand in his right hand pocket, and pulled out a dime and threw it down on the counter. Witness gave accused a nickel in change.

He said "they are a two cent cigar, he guessed he would have to pay five cents for it." DeMoya told him it was a five cent cigar straight to everybody. The accused offered witness some bananas, but the latter said he had just eaten some. Accused then took out the bananas and ate them and threw the peelings on the floor. DeMoya asked accused kindly not to throw the peelings on the floor, but he kept on. DeMoya asked accused again not to throw the peelings on the floor, as some of the customers would come in and break their necks. Accused said "here you are," and threw two on the floor again. Then De-Moya went outside the store and accused followed him and walked about fifty yards from the store. Deceased was in front of the store, and asked accused to pick up the peelings. DeMoya asked deceased to make accused pick up the peelings. Accused told deceased that he would not pick up the peelings, and deceased said: "Oh, yes you will," and accused said again he would not pick them up. Deceased then went up to accused, and he then said : "Yes, I will," and then went in and picked up the peelings. After accused picked up the peelings, he said to DeMoya : "Now you are satisfied, ain't you," and DeMoya said : "You were brave; you thought there was no policeman on this block." The accused then walked about fifty yards from the store, came back and asked deceased to show him the number of his badge. Deceased threw back his coat and said "there it is." Accused walked

off about three yards, came back and asked deceased again to show his badge. Deceased put his finger to it and said "there it is." Accused came back the third time and asked deceased to show his badge. Deceased said "damn you, there it is." Accused took hold of it with his hand and turned it around; deceased grabbed accused. Witness then saw three flashes and heard three reports. This was about five minutes after accused came back the third time. Witness then went back to the end of the store and opened the back door and DeMoya and witness ran up Adams street. As they were running witness heard some one run in the store and halloo "oh," and then fell. Accused had his right hand in his right hand pocket all the time. He was about two feet from deceased when he fired.

DeMoya testifying for the State, corroborated Caricio in every particular in his testimony. In addition, DeMoya said the accused was the man who did the shooting, and he shot deceased before he hit accused. When deceased grabbed accused the former threw up the hand in which he held the club when the shooting commenced. Deceased struck accused after he was shot. The accused appeared to be under the influence of liquor when in witness' store.

Frank Land testified for the State that he was standing near DeMoya's store and saw the accused shoot deceased, Carleton Lowe. Deceased told accused to pick up some banana skins from the floor of

DeMoya's store, which accused at first said he would not do. Deceased told him if he did not he would maul his damn head off. Accused then picked them up and started off and got a couple of feet, then turning, asked deceased to let him see his badge. Deceased showed it to him. Accused started off and deceased told him to go on, he was a good runner. Accused, after going a few feet, went back again and asked deceased to show his badge. Deceased again showed it to him. Accused again started off and again turned and asked to see deceased's badge. Deceased turned back his coat and said "there, damn you, there it is." The accused took hold of it as if to look at it, when deceased grabbed and threw up his hand in which he held the club, when accused shot him. Accused shot before he was hit by deceased. Deceased struck accused after the first shot was fired. Witness was certain that accused fired before he was hit by deceased. He fired before he was struck, and twice afterwards. One shot struck the badge, one the forehead, and one just below the left nipple. After the shooting, deceased went into the store of DeMoya and fell. Witness went into the store and saw deceased lying down dead.

W. J. Allen, for the State, testified that he was Sergeant of Police of the City of Jacksonville when Carleton Lowe was killed, and that he had seen the accused before. On the 27th of February, 1890, the day following the killing, a party of men started in pursuit about twelve o'clock, and went into the north-

west part of the city, in the rear of the Sub-Tropical building, where the forces were divided. Witness went in a westerly direction down to the left of the slough. Witness followed slough, along the edge of the brush, and went into the brush in several places, then followed a little path that led out into the swamp. When about fifteen feet out, he caught sight of a man sitting up or reclining on his right hip. Witness said "hello, captain, what are you doing there?" He replied "I am sick." Witness then drew his revolver and said "well, if you are a sick man, get up and come out till I see who you are." Witness did not then know who he was. The man said "don't shoot me, for I have got a revolver here." He did not have his revolver in his hands but it lay on the ground by his side. He took it up. Witness told him to lay it down, for if he put his finger on the trigger, he was a dead man. He laid the revolver back on the ground. Witness then told him to throw up his hands and come out, and he said "all right, I will." Witness called to him four or five times, and he made the same answer, but made no effort to come out. Witness then thought that by shooting at him it would intimidate him and cause him to come out. Witness fired one shot, aiming about fifteen inches to his left, to which he paid no attention, except to turn his head. Witness then shot a third time, nigher than before, when he said "for God's sake, captain, don't shoot me, and I will come out." He then got up and came out. Witness then asked his name, and he replied, Robert

Armstrong, and said you have got a warrant for me, have you not? Witness then informed him that he did have a warrant for his arrest, and asked him to come out. He followed with his hands above his head. He had nothing except an old pocket knife and some letter paper. Witness said to him : " I want you to take a straight shoot from here to the station house ; these bushes are full of armed men looking for you." He said : " All right ; let me go back and get my pistol." Witness said " No, you cannot go back and get your revolver ; I will come back and get it." He said " All right." Witness told him to put down his hands, and he did so. After carrying the accused to the station house, witness returned and got the pistol, which was fully loaded with six cartridges. Witness identified pistol which was shown him on the stand. Witness further states that when he shot at accused, he made no effort to get away ; that three or four cartridges were gotten out of his pocket, and the accused is a black man, and the deceased was a white man.

Paul G. Phillips, recalled, further testified that after the accused was placed in the city jail, he was conveyed in witness' buggy to the county jail. On the way the accused said to witness that he knew Sergeant Allen was not shooting to kill him, because if he had shot to hit, accused would have certainly shot him.

The accused made his statement, which is as follows : Mr. Towles and other men hunted for me to kill me, and run me from down South. They followed me up here and got the police in with them. Chief Phillips there got $2,000 of their money to help

them. I kept out of the way all I could, but went down that night and that policeman Lowe tracked and followed me way out to Brooklyn and back, and was on my track when I went to get a cigar. He came up to me and would have killed me, but I shot him. They are after me now. They have a man in the garret at the jail, put there to kill me the first chance. They come there to my cell and look in and go off and report and send dispatches about me. I expect they will crack my neck. They have been trying to kill me for some time, and I reckon they will do it.

Elsie Wesley, for defense, testified that she had known the accused since they were children ; they were cousins ; there is insanity in the family, both on the father's and mother's side. Witness' mother was accused's aunt, and she lost her mind. The sister of the accused lost her mind ; his sister used to preach sometimes ; would curse awhile and preach awhile ; hold up her skirts and talk all sorts of dirty talk. She used to say we were trying to kill her ; she got burned up in a crazy fit ; there was a fire in the yard, and when we found her she was on fire and did not try to put it out, but burned to death. Witness' uncle tried to put out the fire, but the crazy sister of accused would not try to help herself. The accused went to the house of this witness about two months before the killing. Witness noticed that he acted strangely ; witness gave him a cot to lay on, but he would not lay on it ; went off to an old out-house and

stayed there. He said there was a crowd of men there after him. He acted so strangely and wild-like, and talked so queer, that witness put it down he was crazy and out of his mind. He would not eat or sleep in witness' house, and seemed to be afraid people would kill him.

Thomas Armstrong, for the defense, testified that he was the father of the accused. He went to witness' house in the summer of 1889, about roasting-ear time and stayed about a month. Witness never saw him again until after the killing. While at witness' house, accused acted strangely and wild, and said people were after him to kill him. One day he went into the cow-pen and yelled like he was crazy. Another time he stripped himself naked and said they are after him to kill him. When witness went to see him after he was in jail, he said he wanted a Georgia lawyer, and did not want any Florida lawyer, as the Florida people would kill him. From the way accused acted and talked, witness thought he was crazy. There is insanity in the family of witness; he had a sister that was crazy, and one of his daughters died in a spell of insanity; she would act strange and wild, and would say people were going to kill her. Witness' father suffered from epilepsy, and his mother was subject to frequent neuralgia for years, and finally died from it. Witness himself suffers from neuralgia in the head, and he had another daughter who had fits.

W. H. Towles, for the defense, testified that he knew the accused, who used to work for witness. The actions and talk of accused, towards the last of the time he worked for witness, were very strange. Witness was told by accused that some parties were trying to kill him ; following him for that purpose, and he would have to leave to save his life. At first witness thought accused was "tight," but afterwards saw that he was not. Witness told accused that nobody was going to hurt him, but he insisted that he was being followed about to be killed. Witness used to send him on errands ; sent him to the doctors, and when he returned he asked witness not to send him there any more, as the doctor gave him whiskey, and he did not want to drink it. Accused bore a good reputation as a peaceable, sober and law-abiding man in the community where he lived; he was a good workman and witness liked him. His story that witness and others followed him to kill him is false, and there is not a word of truth in it. The last time witness saw the accused until the trial was in the summer of 1889, when he was sent on an errand and never returned. From the actions and talk of accused during the latter part of his employment by witness, his opinion was that the accused was insane.

Ziba King, for the defense, testified that he knew the accused, and that he worked for witness in 1889. Accused went to witness' house seemingly much frightened, saying that W. H. Towles, the Hender-

son boys and others were following him to kill him, and asked witness to protect him. Witness told accused that nobody was going to hurt him; that he could stay and work for witness, and he would protect him. Accused stayed with witness about one month. He would not sleep in the place prepared for him, but would sometimes sleep under the kitchen. He pulled up a plank to get under the corn crib, and slept there some. He stopped up all the cracks in the crib by nailing slats over them. Witness asked him what it meant, and accused said every night people would come to the place to kill him, and that he got under the crib to hide, and had nailed up the cracks to keep them from shooting through. Accused said that witness' son was trying to kill him; witness enquired about it, and found that nobody was bothering the accused; he kept up his strange actions and talk, and finally told witness that he would be killed if he stayed longer, and that he could not stay longer; that a gang were after him so hot that he would have to leave. He left, and witness saw him no more until the trial. From his manner and talk, witness was satisfied that the accused was insane. He bore a good reputation as a sober, peaceable, law-abiding man, and did his work well.

G. B. Hodge testified for the defense that he knew the accused, who worked for witness some time in 1889. His actions were very singular. Witness saw him holding conversations with imaginary characters

in the grove; he said that he was being constantly pursued and watched by men who were trying to kill him. Witness reasoned with him, and told him there was no danger, but one day accused informed witness that he could not stand it any longer; that if he stayed there he would be killed; he asked for a discharge, and on receiving it left. Witness had not seen him since until the trial. From an observation of his actions and conversations, witness was of the opinion that the accused was insane. He was a good hand, and stood well as a peaceable and law-abiding man.

J. E. McGinniss, for the defense, testified that he was a lawyer and knew the accused. Witness went to the jail after the killing four or five times to see him, and each time had talks with him; observed his demeanor, deportment and conversation; he acted foolishly, and said that he did not want an attorney, but was going to defend himself. Witness formed the opinion from an observation of the demeanor and deportment of accused, that he was insane.

Pat Falon testified for the defense that he was keeper of the Duval county jail, and had been for the past ten years; that there is no one in any part of the jail, nor has there been any one, to molest the accused. No one has been spying him, peeping through his cell or sending off dispatches about him; "it is all untrue."

J. N. Stripling also testified for the defense that he was United States Attorney for the Northern District of Florida. He had seen the accused several times before the trial. In the Fall of 1889, he received a communication from Attorney-General Miller, enclosing a letter purporting to be written by Robert Armstrong to President Harrison, complaining of being pursued by a band of men to kill him, Armstrong. The accused was examined by witness, and he stated that Bill Towles and some others had been around his house for three weeks every night, armed with guns; that their conduct was threatening, and that for about three weeks every night they had stood guard around his house. He said that he had seen them through the cracks around his house; that one night he went out and they run him into the woods and shot at him several times; he managed to get away from them, and dodged into the swamp, and every now and then they would find him, jump him up and shoot at him again. He further stated to witness that they pursued him all the first night, but he managed to get away from them, and lay out in the woods all next day, but the same crowd, some ten or fifteen of them, got after him the next night and again frequently shot at him. They pursued him all the second night, and he got away from them about morning of the third day. The third night he got near Senator King's, member of the Florida Legislature, from whom he asked protection; that Senator King told him to go

into the kitchen and sleep, and he would see that these parties did not trouble him any more. He said he went into the kitchen, but it was not long before he heard them around there, and he then got scared and crawled under the kitchen, when they began to throw under there at him. He got frightened and ran from there, and they pursued him again nearly all that night, and shot at him several times, but he was never hit. He did not know why it was they missed him in that way. The imagined wrongs of the accused seemed to impress him very much, he cried and seemed to think he had been very badly treated, without any protection, and no law to appeal to. The accused further stated to the witness that he got away and went to Georgia, and remained there perhaps three months, and returned as far back as Orange county, which is he supposed, about one hundred miles from Ft. Myers; that the first night he got back to Orange county, Bill Towles and that crowd got after him again, and there was a colored man who tried to get him to go out, and that he, the accused, saw Bill Towles on the top of an orange tree trying to shoot him. Witness examined the accused very closely, and the latter went considerably into detail. The tale was very improbable to witness, and he asked the accused to come back again, to see if he would tell the same tale. Accused returned and repeated the same two or three times. Finally witness told accused that Bill Towles was in town and wanted to see him. This

seemed to frighten him very much, and he said he knew he would be killed if Bill Towles was there. From the tale he told, and his manner and deportment, witness was satisfied that the accused was insane on that particular subject; otherwise he appeared rational, expressing himself more intelligently than the average colored man. Witness' first impression was that the accused had an attack of *delirium tremens*, and had been drinking, but he said no, and witness saw that such was not the case. Witness thought he was insane on that subject, and was thoroughly satisfied of it. Witness knew the parties about whom accused complained, and was satisfied it was a delusion. After hearing the statement of the accused, witness took him before Philip Walter and Mizell, where he repeated the same thing, but did not go as fully into detail as with witness. The reason why witness examined into the matter was because of the letter which he received from the Department of Justice. The accused is the person who appeared before witness and made the statements.

Philip Walter also testified for the defense that he was United States Commissioner, and clerk of the United States Court, and had seen the accused before. Witness heard him make a statement in the presence of Mr. Stripling and Mr. Mizell some time in the Fall of 1889. The accused was before the witness three or four times. He went before witness as United States Commissioner. The first time he appeared before

witness, he said that he had been driven from South Florida by a large crowd armed with Winchester rifles. Witness told him that he had no jurisdiction, and accused got angry and left. Four or five days afterwards he returned and said that the same people were still trying to kill him, and stated how he had gotten into a tree, and that they were going to kill him and take his wife away. Witness sent for Mr. Stripling, United States Attorney, and told him that in his opinion the man was insane, and ought not to be let go at large. Witness did not see any way to do anything with accused. About ten days after this he came either into Mr. Stripling's or Judge Swayne's office and brought a letter, witness could not say whether signed by the President or his private secretary. It was to the effect that the District Attorney would investigate the charge that the accused had been imposed upon and driven about throughout the State by armed men. We decided that from the man's tale and his manner that he was insane. The different interviews with the accused held in presence of witness lasted about ten or fifteen minutes each, and when told that nothing could be done for him, did not want to go. In making his statements he was wild and boisterous, and sometimes saucy. He had the manner of a crazy man, and on that and on his statements in the interviews, witness based his opinion that accused was insane on that subject.

G. I. F. Garvin also testified for the defense that he knew the accused. First time witness saw accused was in June or July, 1889, on Bay street. The next time between July and September same year. The latter part of September witness was keeping at the waterworks bridge, and accused went in and said he wanted to see witness on some business, to write for a pension for him. Witness asked if he was a soldier, and he said yes. Witness asked him what regiment he was in, and he said I cannot tell now. Accused said "I want to say something to you I don't want anybody to hear;" he said "I want you to write me a letter." Witness asked was it about the pension, and he said "I do not want to talk about the pension; I want you to write me a letter to President Harrison." Witness said to him the President will not notice a letter from you. He said "I want to write about my wife and myself being run away from Lee county." Witness asked him in what part of the State was Lee county, and he said down south. He said he had written, but they had paid no attention, and he wanted witness to write. He then said that he had been forced to run away from Lee county. Witness asked him why he did not go to the State authorities, and he said he wanted to write to President Harrison. About a week after this, accused went back to witness and said the President had referred his letter to Mr. Stripling for investigation, and that Mr. Stripling would pay no attention to it, and that witness ought to write to the President. He then asked me to write as he would dictate, and said "Now, I want you to write for a pen-

sion for me." Witness started to write and when he got to the company and regiment, accused said "Damn it, if you will not write to the President what I want you to write, I will go out and get some one else to write. I have got a letter that my wife has been hung ; taken out to a tree and hung." · Witness told him he ought to report it to the State authorities, and he said "No, I am afraid to stay here any longer ; the same crowd is after me." Witness asked him how he knew it, and he said he felt that way, and again wanted witness to write. Witness refused, and accused cursed him and went away. In a couple of days he came back again and insisted that witness should write ; he said that the crowd that had been pursuing him were in the city. From his manner and statements, witness thought he was crazy. Witness talked with accused at least a dozen different times. The conversations lasted from five minutes to half an hour, and from his talk and his general manner on said occasions, witness formed the opinion that he was insane.

Dr. N. Van de Howard testified for the defense as follows : I am a medical doctor ; have had considerable experience in the care and treatment of the insane ; was for twelve years connected with the St. Louis Lunatic Asylum, and for nine years chief physician in charge. I have examined the defendant, and find that he suffers greatly from vertigo, and that his sleep is troubled and disturbed. His perception is very dull and his comprehension unusually sluggish ; mental confusion is easily produced. When asked an abrupt question, it is evident from the expression of

his face that he feels puzzled, and that it requires an effort and an appreciable amount of time to enable him to fully comprehend its import. He is afflicted with delusions, and notwithstanding his general sluggishness, when started on the subject of his delusions, he speaks well and fluently; this is to be expected. This dullness of perception and sluggishness of comprehension are illustrated when the sergeant shot at him so often before moving. It was also displayed on the occasion of the homicide when he asked the policeman three times to show his badge. Here he was endeavoring to arrive at some conclusion as to the identity of the officer. He has hallucinations of sight and hearing, as well as delusions that people are trying to kill him, and are following and watching him for that purpose. That is to say, he imagines the existence of facts, and that he sees and hears things and sounds that have no existence in fact. In addition, he is also a prey to various insane delusions. In short, I find him to be decidedly and undoubtedly insane; he should have been in an asylum long ago. He has a delusion that a man in the jail is trying to kill him, in league with the police; that he is being pried on and dispatches sent out daily about him; that a band of people followed him from South Florida to Jacksonville, where the police force leagued with them to kill him. I have heard the evidence in the cause, beginning with that of the police sergeant, Allen; did not hear the evidence of the witnesses previously examined, and it tends to confirm my personal examination, and convinces me beyond doubt that he was insane when he shot the

policeman.   The testimony also demonstrates that his insanity is more general in its character than would be inferred from the existence of the delusions alone.   In other words, it shows that his feelings and emotions are affected as well as his intellect, and that in consequence his mental disease has shown itself in insanity of action, as well as the insanity of thought; that is to say on various occasions his conduct has been just as absurd and insane as his ideas.   I would classify his insanity as chronic mania ; not monomania ; for he has several delusions as well as hallucinations ; and as I said before his actions have been as insane as his thoughts.   The fact that this man worked, even in a position of responsibility and trust, argues not against his insanity.   This is not unusual.   In the asylum, of which I had charge, nearly all the work was done by the patients ; the employes acting rather as supervisors than workers.   The insane men and women worked in the kitchen, laundry, garden, carpentering, and even acted as assistants to the engineer in the boiler room. My assistant clerk was for some time a patient, and made a good clerk, too.   One man who had owned or managed a small hotel, who imagined he was Jesus Christ, and who was found to be harmless, was released at the request of his friends, to resume the management of his business.   That a man can be insane, and still attend to business, is easily explained. The general or lay view entertained regarding the sense of the insane is altogether erroneous.   Insanity is not a loss of mind, but a perversion or derangement of it. It is in dementia, imbecility and idiocy, and not in true

insanity, that there is loss or absence of mind. Insane men are often very bright. A few years ago the asylum in Alabama published a small paper which was edited and printed by one of the insane patients. In many cases only a part, relatively a small part, of the brain is diseased. There is plenty of sound and healthy brain left for all the practical purposes of life, if it were able to act, but in its early and acute stage its activity is to a greater or less extent inhibited or held in check by the irritation arising from the diseased tract. All mental activity directly depends upon a full supply of fresh blood to the brain. If there is too little within certain limits, we grow dull and sleepy, if too much exhiliarated or excited, or even in certain cases delirious. When a tract of the brain becomes diseased in commencing mania the amount of blood is greatly increased, its activity becomes excessive, and the delusions, hallucinations and morbid feelings produced, entirely monopolize the attention, and often completely overwhelms the rest of the mind. He may be entirely under the dominion of his disease, and in this stage is ordinarily incapacitated for the discharge of his ordinary duties. This condition may last for a few months, and even for years, but eventually, if recovery does not ensue, it gradually passes from the active and acute to the chronic and passive state. The irritation subsides, congestion becomes less, excitement gives way to comparative tranquillity, and in consequence the sound part of the brain released from such control becomes again active, and re-asserts its dominion. The man becomes accustomed, as it were,

to his insane fancies, and may at times even have doubts as to their reality. He therefore talks of them less, behaves with comparative propriety, and under most circumstances presents to the average and unskilled observer the appearance of a sane man. But the disease is still there, though comparatively latent, and liable at any time to spring into activity. It only needs an increased supply of blood, a congestion of that tract, to bring all the delusions, hallucinations and insane feelings as acutely vivid and real as ever. Now, nothing is more likely to produce this congestion more rapidly than irritation, excitement or anger. Just as these cause the face to flush and the head to grow hot, they in a much greater degree cause the diseased tract of brain in an insane man to become congested with blood; his mind becomes overwhelmed with the force of his insane feelings, he loses all self-control, and in a very short time may be transformed from a lamb to a tiger. This is just about what must have happened to Armstrong on the night of the homicide. He was undoubtedly insane, and the act was caused by the insanity, and was the direct result of an insane delusion which he entertained in relation to the man he killed. I think the evidence unmistakably shows this. This man believed that the South Florida gang had followed him to Jacksonville, and that the police force had joined them. Under the influence of this delusion he imagined that he had been tracked that night. This of itself was sufficient to produce a certain amount of excitement, which of

course increased the flow of blood to the head. The altercation with the keeper of the fruit store increased the congestion, and he must have been under considerable suppressed excitement when accosted by the policeman, who by threatening him, made his condition much worse. The congestion by this time had become so severe that he imagined that he recognized in the officer the member of the gang who had been tracking him around town. Naturally this created a feeling of alarm and apprehension. He asked the policeman three times to let him see his badge. The slowness of mind and sluggishness of comprehension caused by his disease made it necessary for him to deliberate some time before he could determine as to the identity of the policeman with some one connected with his delusion, or as to the best course for him to pursue. I am of the opinion, most undoubtedly, that the act of killing was the consequence of his insanity, and directly the result of an insane delusion. Insanity in a family may be handed down by inheritance from one generation to another, sometimes skipping one generation or more, and manifesting itself in a later one; and in order for it to be inherited, it is not always necessary that the fore-parents should have been actually insane, for when the family stock has suffered from epilepsy, neuralgia or kindred diseases, it may eventuate in insanity in following generations, indeed that is the tendency. Thus assuming a case as shown by the evidence which I have heard and digested, I am of the opinion that the man was insane at the time of the commission of the act,

JUNE TERM, 1892.     195

Robert Armstrong v. The State of Florida. —Opinion of Court.

and is insane now.   The fact that defendant endeav-
ored to escape is not at all inconsistent with insanity ;
but, on the contrary, affected with his delusion, that
would be a natural instinctive impulse ; nor is it in-
consistent with his insanity that he run an engine, or
performed other ordinary acts.

In rebuttal, the State introduced J. D. Baker, who
testified that he kept the Duval hotel, and had the
accused in his employment about a month before, and
at the time of, the killing of policeman Lowe.   Ac-
cused was employed as fireman to run a little boiler
for the hotel, and yard man.   The boiler was about ten
horse-power, and accused managed it.   Witness would
go around occasionally and supervise.   There was no
machinery to it, nothing but the boiler.   It carried
about thirty-five or forty pounds of steam ; seldom
got over that.

Also Jacob Hildebrandt, who testified that all he
knew about the accused was that witness had seen
him come into his store, buy what he wanted and go
out.   Witness never said anything to accused or sold
him anything.   He would buy tobacco and whiskey
from witness' clerk.

Also Ed. Williams, deputy sheriff, who testified
that he had known the accused since he had been a
prisoner, and had seen him several times since then,
most frequently about the time of his arrest and about
five days after, when witness stayed in the jail at
night to guard him.   The accused appeared to the
witness about like any other prisoner charged with
murder.

The foregoing is substantially all of the evidence certified to us. That Carleton Lowe came to his death by means of a fatal bullet discharged from a pistol in the hands of the accused, and under circumstances without apparent justification or excuse, is not denied and can not be gainsaid. If the accused at the time of the killing was sane, and hence a responsible moral agent, it must be conceded at once that he is guilty of an unjustifiable and brutal murder. On the contrary, if he did not have capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act he was doing, and was not conscious that he was committing a criminal act for which he would be punished, he can not be held amenable to the law as a criminal. There is a very great conflict of authority as to what degree of proof on the one side or the other is requisite to determine this issue, but we are relieved in the present instance from the labor of weighing the conflicting views and opinions on this subject, as our own court in a former decision, and repeated in this very case when here before, has laid down the rule to govern in such issues. The rule we recognize is, that when evidence is introduced which tends to rebut the presumption of sanity on the part of the accused, and the jury entertain a reasonable doubt, after considering all the evidence as to his sanity, it is their duty to acquit. Hodge vs. State, 26 Fla., 11, 7 South. Rep., 593; Armstrong vs. State, 27 Fla., 366, 9 South. Rep., 1. That this is the correct rule on this subject, we enter-

tain no doubt.   In every criminal prosecution it de-
volves upon the State to establish that the crime
charged has been committed by a rational, responsible
being, and no conviction can correctly be had until
the jury are satisfied beyond a reasonable doubt that
the criminal act has been committed by such a being.
The definition of murder by our statute, "the unlaw-
ful killing of a human being, when perpetrated from a
premeditated design to effect the death of the person
killed," includes this element of a rational agency,
and it devolves upon the State to show the sanity of
the accused, as well as any other element of the crime.
The presumption of innocence with which every man
is clothed, imposes upon the State this burden of es-
tablishing beyond a reasonable doubt every material
ingredient of the crime alleged.   In what is here said,
we do not wish to be understood as intimating that
when the State has shown by competent evidence the
facts and circumstances constituting criminal conduct,
and from which no presumption of insanity arises, it
devolves upon her primarily to introduce evidence to
show the sanity of the accused.   The law presumes
all men are sane, and in the absence of evidence indi-
cating a contrary state of mind, both court and jury
are justified in acting upon this presumption, and
where the evidence establishes the criminal act, and
indicates nothing as to the mental capacity of the ac-
cused to commit the deed, a conviction is not only au-
thorized, but should follow.   If, however, there arises

from the evidence, coming from any quarter, a reasonable doubt as to the sanity of the accused, the presumption of the law is overcome and he is entitled to an acquittal, unless the State meets and removes the reasonable doubt arising in his favor. Church, C. J., in expressing the opinion of the court in Brotherton vs. People, 75 N. Y., 159, said: "Crimes can only be committed by human beings who are in a condition to be responsible for their acts, and upon this general proposition the prosecutor holds the affirmative, and the burden of proof is upon him. Sanity being the normal and usual condition of mankind, the law presumes that every individual is in that state. Hence a prosecutor may rest upon that presumption without other proof. The fact is deemed to be proved *prima facie*. Whoever denies this, or interposes a defense based upon its untruth, must prove it; the burden, not of the general issue of crime by a competent person, but the burden of overthrowing the presumption of sanity, and of showing insanity is upon the person who alleges it, and if evidence is given tending to establish insanity, then the general question is presented to the court and jury, whether the crime, if committed, was committed by a person responsible for his acts; and upon this question the presumption of sanity and the evidence, are all to be considered, and the prosecutor holds the affirmative, and if a reasonable doubt exists as to whether the prisoner is sane, or not, he is entitled to the benefit of the doubt, and to an

acquittal." The authorities holding the views we have stated above are recognized by our court as being correct. *Vide* authorities cited in Hodge's case, *supra.* We have stated the rule fully, in order to apply it to the facts of the case before us.

The only objection made here to the relevancy of the testimony is to the statement of De Moya, that while in his store the accused appeared to be under the influence of liquor, but it does not appear that this objection was made in the trial court, and hence no questions are presented as to the admissibility of any of the evidence. It must be conceded that there is nothing in the facts and circumstances of the killing, as shown by the State, to justify a contention that the presumption in favor of sanity which applies to all men was overthrown in the case of the accused. It is true that there are some circumstances shown by the State, such as the conduct of the accused in reference to seeing the badge of the deceased, and the very peculiar circumstances attending the arrest and the shooting at accused by Sergeant Allen, the day after the killing, which a jury would be authorized to consider on the issue of insanity; still we do not think these alone are sufficient, in view of the other attending circumstances, to impose upon the State the necessity of introducing other testimony in aid of the legal presumption in favor of sanity. Looking to the testimony introduced for the defense, we find that in 1889, commencing probably earlier than in June (cer-

tainly at that date) and continuing to near the time of the killing, the accused was laboring under a strange delusion that he was being pursued by a band of armed men for the purpose of taking his life. The facts and circumstances, and the opinion of witnesses based upon them, indicating that during the time mentioned the mind of the accused was overwhelmed with this delusion, are clear and unmistakable. Aside from the testimony of the expert, Dr. W. Van de Howard, at least nine witnesses detail appearances, conduct and declarations on the part of the accused that make it reasonably certain he was under the dominion of the false notion that he was in constant danger of being killed by armed men whom he supposed to be on hunt for him for that purpose. This hallucination manifested itself in his conduct in various ways and on divers occasions, and we do not discover in the evidence indications of its being a feigned case on his part. These witnesses conversed with him on the subject of his delusion, observed his strange conduct, and gave it as their opinion that he was insane on that subject. They are not shown to be experts in such matters, but the weight of authority is clearly in favor of admitting such testimony on an issue of sanity *vel non*. No objection was made to it on the part of the State in the case. 11 Am. & Eng. Ency. of Law, page 161, and authorities in note 1 to heading "Opinions of non-expert witnesses ;" 1 Wharton's Law of Evidence, section 451; Connecticut Mu-

tual Life Ins. Co. vs. Lathrop, 111 U. S., 612 ; Mc-
Clackey vs. State, 5 Texas Ct. App., 320 ; Webb vs.
State, *Ibid*, 596 ; People vs. Sanford, 43 Cal., 29 ;
People vs. Wreden, 59 Cal., 392 ; State vs. Klinger,
46 Mo., 224 ; Wood vs. State, 58 Miss., 741 ; State *ex
rel.* Nave vs. Newlin, 69 Ind., 108 ; Sage vs. State, 91
Ind., 141 ; Clark vs. State, 12 Ohio, 483. It may be
proper to state that such witnesses can not express a
general opinion as to sanity, nor can they give an
opinion independent of the facts and circumstances
within their own knowledge, but they can detail the
facts known to them which show insanity, and there-
upon express an opinion as to the sanity of the person
whose mental condition is being investigated. Of
course the value of such testimony must depend
largely upon the opportunities of the witnesses to
correctly observe the appearances and conduct of the
person whose mind is claimed to be unsound, as well
as the character of such appearances and conduct.
The witnesses who testify as to the mental disorder of
the accused had an opportunity to observe him closely,
and some of them made special investigation as to his
condition. In addition, the father and cousin of the
accused testified that insanity existed in his family,
and detailed facts and circumstances in connection
with the mental derangement of certain members of
the family. They are near relatives of the accused,
it is true, but no show of contradiction of these facts
appears on the part of the State. The expert, Dr.

Howard, who had had long and extensive experience
in the treatment of the insane, testified that he had
examined the accused and found him undoubtedly in-
sane. He details the condition of the accused upon
which he bases his opinion. The State does not offer
any evidence to show they are not true. This witness
does not state when he made the examination, but his
testimony shows that he was speaking of a condition
existing at the time of trial. Carleton Lowe was
killed in February, A. D. 1890, and the witnesses tes-
tified on the second trial, which was in December, A.
D. 1891. We can not infer that this witness either
examined or saw the accused at or about the time of
the killing. While a subsequent unsound mental con-
dition may be shown on such an issue, its relation in
point of time should not be overlooked. He further
states that he did not hear the evidence of the wit-
nesses examined prior to the examination of Sergeant
Allen, and from this we are informed that he did not
hear the evidence of Caricio, De Moya and Land, who
alone detail the facts and circumstances immediately
connected with the killing. He says : "I have heard
the evidence in the cause, beginning with that of the
Police Sergeant, Allen; did not hear the evidence of
the witnesses previously examined, and it tends to
confirm my personal examination, and convinces me
beyond doubt that he was insane when he shot the
policeman." No hypothetical question covering the
facts of the case, it appears, was submitted to the
witness, yet it is evident that he in some way had been

placed in possession of the entire evidence, as he refers to the fact of the accused asking three times to see the policeman's badge, which fact was only testified to by witnesses whose evidence he did not hear, and to other facts detailed by witnesses who were examined after him, in rebuttal.  We need not stop to examine the rule applicable to the admissibility of evidence on the part of medical experts, as no point has been raised in reference to the testimony now before us; but in passing upon this testimony we deem it proper to mention the foregoing facts, as important questions may hereafter arise in similar cases.  Giving due consideration to the entire testimony, we think it is sufficient to rebut the legal presumption of sanity, and to raise a reasonable doubt as to the mental capacity of the accused to comprehend his situation, and the relation in which he stood to others as bearing upon his conduct in reference to the homicide ; and we think the testimony showing his want of mental capacity covers a period of time from early in the year 1889, until a short time before the killing, certainly not longer than two months.  Not only do we think the testimony sufficient for this purpose, but we think a fair consideration of it irresistibly leads to such a conclusion.  To conclude otherwise would necessitate the rejection of a mass of testimony coming from credible sources, without conflict or impeachment, for it will be observed that the State offered no testimony whatever relating to the condition of the accused in any way during the time above mentioned.

But was he insane at the time he fired the

fatal shot that terminated the life of the faithful police officer ? This is the question, as it must appear he was insane at that time ; it not being sufficient that he was insane before or after, unless he was also insane at that time. It is clearly settled by authority that where insanity of a permanent type, or of a continuing nature, or possessed of the characteristics of an habitual or confirmed disorder of the mind, is shown to have existed prior to the commission of the act, it is presumed to continue, until this presumption is overcome by competent testimony. It is well to observe that this presumption does not apply to temporary or spasmodic mania, to disorders of mind produced by the violence of disease, or any form of temporary insanity. Mr. Wharton says, in sec. 63, Vol. 1, Criminal Law : "When insanity of a permanent type is shown to have existed prior to the commission of an act, it will be inferred to have continued, unless the contrary be proved, down to the time of the act. It is otherwise, however, when the proof is of temporary or spasmodic mania, or of *delirium tremens.*" See also 1 Greenleaf on Evidence, sec. 42 ; Lawson on Presumptive Evidence, p. 179 ; 2 Bishop's Criminal Procedure, sec. 674 ; Langdon vs. People, 133 Ill,, 382; State vs. Wilner, 40 Wis., 304 ; State vs. Reddick, 7 Kansas, 143 ; State vs. Lowe, 93 Mo., 547. Mr. Wharton further says, in Vol. 2, Law of Evidence, sec. 1263, that the presumption as to the continuance of insanity is one of fact, varying with the particular case, and Mr. Bishop says, in Vol. 2, Criminal Procedure, *supra :* "The presumption being that the

state of mind proved is continuing, and what exists at one time exists also at another, still, this evidence, to be admitted, or at least to be very weighty, should not refer to a period too long before or after the time when the criminal act was done." The learned Judge who presided at the trial of this cause recognized this rule of law as he charged the jury that " when insanity is shown to exist a short time before the act, the State must produce evidence to show sanity, else the continuance of insanity is presumed, and the accused must go acquit." The testimony authorized such a charge, and, in our judgment, shows unmistakably that the accused was afflicted with a mental disorder of a permanent nature, not resulting from a temporary cause, but a fixed delusion that his life was endangered by armed men, who constantly sought to take it. His mental derangement was of such a nature as to affect directly his action in taking the life of the policeman, who was supposed by the accused to be in concert with the armed band in search of him. We have no doubt about the testimony showing such an infirmity of mind on the part of the accused as to bring it within the rule of presumption that it continued to the time of the homicide, under the facts of this case.

Is the presumption in favor of insanity at the time of the homicide, clearly arising from the evidence introduced in behalf of the accused, rebutted by the State? We are unable to bring our minds to such a conclusion. What testimony the State introduced in rebuttal can not be said to bear directly upon the sub-

ject of the fatal delusion with which it had been shown
the accused was afflicted. The deputy sheriff says
that he had seen the accused several times since he
had been a prisoner, and that he appeared to the wit-
ness about like any other prisoner charged with mur-
der. Hildebrandt saw the accused come into the
store, buy what he wanted and go out. This witness
never conversed with accused or sold him anything.
The buying was from witness' clerk. When this was
he does not state. J. D. Baker, who kept a hotel,
states that the accused had been in his employment
about one month when the killing took place, as fire-
man, and managed a small boiler, about ten horse
power, under the supervision of witness. The boiler
had no machinery. This is the only fact stated by
the witness in reference to the capacity of the accused.
These witnesses do not speak of any actions or con-
duct of the accused in reference to the delusion under
which, it had been shown, he was laboring. The facts
they state are not inconsistent with the evidence
showing a disordered state of mind of the accused, on
the subject of being pursued by armed men for the
purpose of killing him. In any view we may con-
sider the rebutting testimony, it can not be said to
meet the case of insanity made against the State by
the testimony in the record in favor of the accused.

We think it is the plain duty of this court to re-
verse the judgment on the evidence in the record be-
fore us. In reaching this conclusion we are not an-
nouncing any new doctrine on this subject in this
court. Speaking in reference to the facts, in the case

of Schultz vs. Pacific Insurance Company, 14 Fla., 73, Judge Westcott said : "The verdict of the jury here is founded on the evidence of facts, complicated and contradictory, which required an investigation into the character and credit of the witnesses, whose testimony it was necessary to compare and weigh. To do this, is, the proper function of a jury. While it is true that this is the proper function and province of the jury, it is at the same time true that in cases where there is conflict in the testimony, it is within the province and power of the court to set aside a verdict which does not reach substantially just conclusions in cases where the conflicts are of such character and the circumstances of such nature as to give just ground for the belief that the jury acted through prejudice, passion, mistake or any other cause which should not properly control them. This power exists in the court. In exercising it the court does not encroach upon the province of the jury, for the reason that it does not conclusively settle facts in the form of a verdict, but only gives another jury the opportunity of so doing, and of correcting what appears to be a mistake. If this is not properly within the power of the court, then the result is, that the first twelve men that happen to constitute a jury in a given case are by law the final arbiters of the facts in that case. There is no such principle of law." And in the case of Wilson vs. Dibble, *Ibid*, 47, Judge Randall says : "It is generally with great reluctance that courts set

aside the verdict of a jury upon a consideration of the testimony alone ; and a second verdict upon the same facts, although the Judges may have come to a different conclusion, is too strongly fortified by the deliberate judgment of twenty-four men, to be disturbed, except for strong reasons. Where the verdict is so palpably against evidence, or against a very strong preponderance of evidence, that great injustice seems to have been done, leading to the conclusion that the verdict was the result of prejudice or excitement, or other improper influences, there should be no hesitation about setting it aside." Judge Van Valkenburgh, in speaking for the court in the cases of Green vs. State, 17 Fla., 669, and Small vs. State, 20 Fla., 780, said, in substance, that in cases of felonies where the penalties are severe, the court will weigh the evidence, and where it preponderates so strongly against the verdict that it can not conclude such verdict was the result of a due consideration of the evidence, a new trial will be granted. These cases, and many others which we might cite from our own decisions, unmistakably establish the doctrine that the courts can not abdicate their supervisory control over the verdicts of juries. Due consideration should always be accorded to their deliberate findings on the facts, and in cases where the testimony is conflicting, and a consideration of the character and credit of witnesses becomes necessary to determine its effect, or where the testimony tends to prove the issue in favor of which

the verdict is rendered, and a jury, in weighing it, might fairly reach such a conclusion on it, the verdict should not be disturbed. In the case before us we think the testimony, about which there is no conflict or contradiction, clearly raises a reasonable doubt as to the sanity of the accused a short time before the killing, and that the testimony does not rebut the presumption arising therefrom, that he was insane at that time, and hence, according to the settled rule on this subject, the verdict is against the evidence. Alvord, Kellogg & Campbell vs. Little, 16 Fla., 158; Meinhard Bros. & Co. vs. Lilienthal, 17 Fla., 501; Wilson vs. Marks, 18 Fla., 322; Miller vs. White, 23 Fla., 301; 2 South. Rep., 614; Grayson vs. Commonwealth, 6 Grattan, 712; Same vs. Same, 7 Grattan, 613.

We do not deem it necessary to consider the other assignments of error made here.

Judgment reversed and a new trial awarded.