## STATE OF FLORIDA v VAN HORN
### Case No. CRC83-2461CFANO
Sixth Judicial Circuit, Pinellas County
April 24, 1987

### APPEARANCES OF COUNSEL

**State Attorney's Office** for plaintiff.
**Patrick Doherty** for defendant.

### OPINION OF THE COURT

CLAIRE K. LUTEN, Circuit Judge.

## ORDER GRANTING MOTION FOR JUDGMENT OF NOT GUILTY BY REASON OF INSANITY

THIS CAUSE came on for trial on April 13, 1987. The Defendant, Ms. Gary Van Horn, was charged by Indictment with Murder in the First Degree occurring on March 17, 1983. Following numerous competency examinations and substitutions of counsel, on January 30, 1984, the Defendant was sent to the Florida State Hospital at Chattahoochee, where she was diagnosed as schizophrenic, paranoid chronic and where she remained until January, 1987, at which time she was found competent to stand trial. The Defendant entered a plea of Not Guilty by Reason of Insanity.

While the case will be discussed more fully later in this Order, in brief, it proceeded as follows. In the State's case-in-chief, it was established that the Defendant had killed Violet Chisholm, by striking her in the head with a lead pipe. The defense did not contest that the homicide occurred or that Ms. Van Horn was the party who caused the death. At the close of the State's case, the defense moved for a directed judgment of acquittal, which Motion was denied.

The defense presented its case-in-chief, which consisted of testimony from the Defendant, Ms. Van Horn, from her step-mother, and from an attorney, as well as from numerous doctors of psychiatry and psychology. Two doctors saw Ms. Van Horn in August, 1982, pursuant to the Baker Act. All other doctors either saw the Defendant shortly after the homicide, during the course of her commitment to the State Hospital or upon her return to stand trial. But for the doctors who examined the Defendant solely for the purpose of the Baker Act, the doctors were unanimous in their medical belief that the Defendant was insane at the time of the offense, due to delusions caused by paranoid schizophrenia.

At the end of the defense case-in-chief, the State called two rebuttal witnesses.

Following the presentation of the State's rebuttal witnesses, the defense moved for a directed judgment of Not Guilty by Reason of Insanity. Both the State and defense argued to the Court and the State furnished a Memorandum of Law.

The Court reserved ruling on the Motion until such time as it could review the case law and memorandum and enter this Order.

It has long been the undisputed law in Florida that a Defendant is presumed to be sane until such time as he presents evidence to rebut that presumption. At that time, the burden shifts to the State to prove, beyond a reasonable doubt, that the Defendant was sane at the time of

the offense. *State v. McMahon,* 485 So.2d 884 (2 DCA, March 1986); *Byrd v. State,* 297 So.2d 22 (Fla. 1974).

It has further been well established that when testimony is presented by the State to rebut the defense of insanity, the question then becomes one for the jury to decide. The jury does not necessarily have to believe expert testimony or non-expert testimony. *Byrd,* supra; *Sands v. State,* 403 So.2d 1090 (3 DCA, 1981).

In its memoranda, the State argues, among others, the above cases in support of its position that the Motion should be denied. The Court will review each case presented.

*Byrd v. State,* supra: Here the defense presented two psychiatrists who testified that the Defendant was insane at the time of the offense. The Defendant had stated he heard "voices from the sky" telling him to commit the crime. Rebuttal witnesses testified; one a personal friend of the Defendant, and one, the interrogating officer. Both rebuttal witnesses stated the Defendant had never told them of hearing voices. The doctors had varied testimony: the first indicated he could render no opinion on the Defendant's sanity; two others stated that they concluded the Defendant was insane. The Court discussed discrepancies in the testimony, as well as conflicts between statements made by the Defendant to the various doctors. The Court reasoned that under these circumstances, the Defendant's sanity was clearly a jury question.

*McClain v. State,* 327 So.2d 106 (1 DCA 1976): Very few facts are contained in this opinion. Apparently a psychiatrist testified for the defense, while two lay witnesses testified to the Defendant's "normal and lucid behavior" on the night of the offense. The Court states "That testimony distinguishes this case from *Armstrong v. State,* 30 Fla. 170, 206, 11 So. 618, 627 (1892)". (This case will be discussed later herein.)

*State ex rel Bludworth v. Kapner,* 394 So.2d 541 (4 DCA 1981): This case dealt with whether the Court could enter a finding of not guilty by reason of insanity where the defense moved for such under Rule 3.190(c). In its Motion, the defense alleged that three doctors were of the opinion the Defendant was insane; the State filed a traverse specifically alleging facts and circumstances from which, according to the State, a jury could conclude the Defendant was sane at the time of the offense. Here the appellate Court found the trial Judge did not have authority to grant the Motion. There are statements regarding the law on sanity and the ability of a jury to disbelieve expert witnesses, but the holding directly relates only to the authority of the Court to grant such a Motion.

*Collins v. State,* 431 So.2d 225 (4 DCA, 1983): Again, there are few

facts given in this opinion and the nature of the expert testimony is not discussed. The appellate Court restates the law that the finder of fact may reject expert testimony in favor of testimony from lay witnesses which permitted reasonable inference that the Defendant was sane.

*Cronin v. State*, 470 So.2d 802 (4 DCA 1985): This case applied the same law regarding expert vs. lay opinion to a marijuana case.

*Sands v. State*, 403 So.2d 1090 (3 DCA 1981): Three experts testified for the defense; however, the footnote at 1091 states:

. . . (E)ven the experts were not in agreement as to what was the nature of the alleged illness.

One felt the Defendant was schizoid and had psychotic tendencies; two felt he was suffering from pathological alcohol intoxication. Lay witnesses testified that he acted in a normal manner at the time of the offense. While there are limited facts, it appears the jury could reasonably infer the Defendant was sane, and the Court so held.

*State v. McMahon*, 485 So.2d 884 (2 DCA 1986): Here the defense presented testimony from a doctor who had not examined the Defendant in over 13 years. This doctor felt the Defendant was a latent schizophrenic, but still knew right from wrong. Three other doctors said the Defendant was insane. The basis of their opinions is not given. Lay witnesses for the defense testified that the Defendant did not appear impaired on the day of the offense; however, one witness believed he was "out of his mind", although the Defendant was heavily sedated when seen. The State presented lay witnesses who testified the Defendant answered questions; understood *Miranda* warnings and followed their instructions; they believed he was sane, as did a crime scene investigator and an acquaintance of the defendant, based upon their observations of him before and shortly after the offense.

In the case at bar, evidence presented in the State's case-in-chief indicated, through a paragraph in one of eight notebooks written by the Defendant at or about the time of the homicide, the Defendant planned the homicide. Further, after the homicide, the Defendant either walked or ran back to her apartment and sat and waited without changing clothes or washing her hands. When questioned at the scene, she indicated she had committed the crime because of "the pain, the unbearable pain". At the time of her arrest, the Defendant evidenced no bizzare behavior and was lucid. No issue of sanity was raised and the evidence was sufficient to present a prima facie case and hence the defense Motion for a directed judgment of acquittal was denied.

The defense presented the Defendant who testified that she suffered a

spiritual affliction, much like that suffered by Job in the Bible. That, as a result of this affliction, she experienced extreme pain. She further testified that God had provided the deceased as a means to rid herself of the pain and that in killing the deceased, she was following God's will and acting in self defense; she was protecting herself from the pain. She further testified she was and is not insane; she merely suffers from the spiritual affliction.

The Defendant's step-mother testified that the Defendant, since her mid-thirties, has been preoccupied with religion; that she had expressed the fact that she suffered from a spiritual affliction; that they were concerned for the safety of others because it appeared the Defendant would do harm to someone to remove the spiritual affliction from herself. A letter written by the Defendant's parents on August 30, 1982, was introduced into evidence containing, in part, this language:

(Gary Van Horn was) dangerously close to using the "ax" on a neighbor last February 12. She was not angry—she was "following God's Instructions."

A second document was introduced, which document the Defendant had wanted her father and step-mother to sign, in February, 1982. This document contained the following language:

I am part of an estate of life circumstance where it is possible for other people to have access by means of supernatural power into the life reasons of my mind and body.

An attorney testified that while working for Legal Aid, in the fall of 1982, she had contact with the Defendant who, at the time, evidenced extreme paranoia. The attorney took the Defendant to a mental health center, but could not understand why the Defendant was not in a mental hospital.

Thereafter, testimony was given by two doctors who examined the Defendant in the fall of 1982, and committed her by the Baker Act. They stated they could not express an opinion on her sanity, as they did not examine her for that purpose, but they felt that due to her delusions, she was unable to take care of herself.

Numerous psychiatrists and psychologists who examined the Defendant shortly after the offense and during her committment at the State Hospital testified that the Defendant was a paranoid schizophrenic. They each stated she was a textbook base and that her mental disease was extreme. Further, they testified that she could function in areas unrelated to her delusion about her spiritual affliction. Her notebooks contained numerous neologisms, which are characteristic of this dis-

ease; she wrote in the books from right page to left page, which substantiated her delusion of an Old Testament spiritual affliction. The notebooks were replete with reference to the extreme pain caused her by this affliction.

The last doctor, Gerald S. Mussenden, examined the Defendant one week prior to trial. He spoke with her and reviewed her notebooks as well as letters written subsequent to the offense. He testified that, after the homicide, the Defendant's writings contained no neologisms and appeared almost to have been written by a different person. He further testified that while the Defendant believed the spiritual affliction to have been eased, the mental disease which created the delusions, as well as the delusions themselves, were still in existence right below the surface of her personality. He stated that she was the most extreme case of paranoid schizophrenia he or his colleagues had ever seen. Tests performed on the Defendant indicated she was a reasonably intelligent woman who could function outside of her delusions. Each and every doctor agreed that the mental disease existed prior to the offense, at the time of the offense, and at the time of trial. They each agreed she was legally insane at the time of the offense. There is now sufficient evidence to create a reasonable doubt as to the Defendant's sanity, and the State presented rebuttal. The Court ordered transcripts of their testimony for purposes of this Order.

The first witness to testify in rebuttal was Dorothy Tucker. She was the Detention Officer at the jail when the Defendant was arrested. As part of her duties, Ms. Tucker searched the Defendant, booked her and spent probably twenty minutes with Ms. Van Horn. Then, during the night, she would check Ms. Van Horn approximately every half hour, from about 9:00 p.m. to 1:00 a.m., when her shift ended. Ms. Tucker testified that the Defendant was aware of where she was, exhibited no abnormal behavior, had no problems walking or talking, did nothing bizzare; that Ms. Van Horn did not appear to be "crazy" and that Ms. Van Horn did not talk about the case, nor was she asked to.

On cross, Ms. Tucker testified she had no background in psychology or related sciences. The following questions and answers were given:

Q. Do you know what a delusion is?

A. See things that aren't there?

Q. A delusion is not seeing; that's a hallucination. But if a delusion is is belief in something that is irrational and a fixed belief in an irrational thing, would you know if somebody was suffering a delusion in your presence or not?

A. I think I would.

Q. Do you think you would need to talk to them about their delusion before you could render an opinion on that?

A. Yes.

Thereafter, Ms. Tucker testified that she had not discussed anything with the Defendant which touched upon, according to the uncontroverted testimony of the doctors, the area of her delusions. Additionally, the following exchange took place:

Q. Did you render an opinion as to her sanity at the time of the offense?

A. She seemed fine to me.

Q. I know, but did you render an opinion as to her sanity at the time of the offense, which was earlier?

A. No.

Q. Do you have an opinion as to her sanity at the time of the offense?

A. No.

There was no redirect.

The second rebuttal witness was Rodney Kosares, who was the case detective at the time of the offense. He had contact with Ms. Van Horn at the station after her arrest. He spoke with the Defendant and indicated she asked about "procedures for bond, obtaining an attorney, in general what would happen from the point of our conversation forward". Ms. Kosares testified she appeared to understand his responses to her questions; she was not surprised that she was being charged with first degree murder; she asked no questions about the crime itself, nor was she questioned about the crime. When asked if he had ever had contact with people who became involved with the Baker Act; he testified yes; when asked if Ms. Van Horn exhibited any of those behaviors indicated in Baker Act individuals, he stated "No, she did not". When asked if she appeared normal, he stated "Given the circumstances for which we were talking, yes".

Q. Did she appear as normal as anybody else that you have had contact with who had been arrested on a first degree murder charge?

A. Yes.

On cross examination, Mr. Kosares testified that he had spoken to the Defendant for approximately ten to fifteen minutes. That was the only time he spoke with her and he has never seen any of her writings.

36

Q. Would you be surprised to know that during this very same period of time in history, she was writing volume upon volume of non-sensible work in notebooks, using words that no other English person uses?

A. Would I be surprised at all?

Q. Yeah.

A. Yes, I would.

And thereafter, there were questions about what constituted a delusion and using a hypothetical delusion, the following exchange occurred:

Q. Okay. And even though I have a delusional system going about the Mafia, I recognize that that's a pen, don't I?

A. Yes.

Q. Because its—it doesn't have anything to do with my delusion; correct?

A. Correct.

and

Q. And it wouldn't have anything to do with the delusion system I'm operating under if I simply sat down with you for fifteen minutes and I asked about the process I was involved in?

A. (no response)

Q. Correct?

A. Correct.

and

Q. If several psychiatrists and psychologists testified that a delusional person could appear relatively normal and ask exactly the questions that Ms. Van Horn asked, would you dispute that?

A. I would have no reason to, no.

Q. Okay. And if several psychologists, including Dr. Merin and Dr. Mussenden, Dr. Smith, several psychiatrists including a Dr. Saa, Dr. Arturo Gonzales testified this person was insane at the time of the offense, you're not really disputing that; are you?

A. I'm not qualified to dispute it.

There was no redirect.

There were no other witnesses and both the State and defense rested. Thereafter, the Motion for a directed verdict of not guilty by reason of insanity was made, argued and taken under advisement.

**37**

The defense argued the case of *Fisher v. State,* 12 FLW 719 (2 DCA, March 6, 1987). To summarize, in this case, the State presented testimony regarding the offense, but no evidence relating to the Defendant's sanity. Motion for direct judgment was denied. The defense, in its case-in-chief, presented the testimony of two psychologists who testified the Defendant was legally insane at the time of the offense, in that the Defendant could not distinguish right from wrong and because he was unable to ascertain reality, he was acting in what he thought was self defense. At the close of the Defendant's case, the State presented no rebuttal. The defense Motion for judgment of acquittal was again denied, and the jury found the defendant guilty. The appeal ensued. In the *Fisher* case, the Court recognized that generally the question of sanity is one for the jury. Further, it recognized that expert testimony is not binding upon the jury. However,

. . . (B)ecause the State failed to present any evidence addressing the issue of the Defendant's sanity, the trial Court erred in failing to direct a verdict of not guilty by reason of insanity. (at 720)

The State argues that *Fisher* is clearly distinguishable since, contrary to what the State did therein, in the case at bar, the State called two witnesses to rebut the defense witnesses, thus putting the case in a posture to go to the jury for final determination.

Due to the fact the District Court of Appeal, First District, in *McClain v. State ibid,* specifically distinguished that case from *Armstrong v. State, id,* this Court felt compelled to review *Armstrong.*

*Armstrong* first a first degree murder case decided in October, 1892. It appears to still be good law in Florida. In *Armstrong,* the Defendant was charged with shooting a police officer. The State presented numerous witnesses to establish that the offense had been committed by the Defendant, and the Supreme Court, in its opinion, spelled out in detail, their testimony, as well as the testimony from the defense witnesses. The defense raised the issue of insanity and presented testimony that the Defendant had a history of mental illness. Expert testimony was presented from the doctor that the Defendant was suffering from delusions and that he was insane at the time of the offense. In rebuttal, the State presented testimony from three witnesses: one stated the Defendant worked for him and managed a little boiler for the hotel; the second was a store keeper who testified the Defendant would come into his store and make normal purchases and would leave; the third was a deputy sheriff who had known the Defendant and who guarded the Defendant after his arrest; this witness testified "the accused appeared" about like any other prisoner charged with murder. (at 624)

The Court spent considerable time discussing both sides of the case and the law. Looking at the State's case-in-chief, the Court, at 625, stated:

It must be conceded that there is nothing in the facts and circumstances of the killing, as shown by the State, to justify a contention that the presumption in favor of sanity which applies to all men was overthrown in the case of the accused.

Looking at the defense case, the Court iterated testimony regarding the Defendant's history of mental illness which existed over a period of time. The testimony of the doctor is discussed, some of which must be restated in this Order, as it is virtually identical to the testimony in the case at bar:

The fact that this man worked, even in a position of responsibility and trust, argues not against his insanity. This is not unusual.

and

That a man can be insane and still attend to business is easily explained. (at 623)

and

I am of the opinion, most undoubtedly, that the act of killing was the consequence of his insanity and directly the result of an insane delusion. (at 624)

At page 627, the Court frames the issue:

Is the presumption in favor of insanity at the time of the homicide, clearly arising from the evidence introduced in behalf of accused, rebutted by the State?

That is virtually the same issue as exists in the case at bar. Has the State presented sufficient competent testimony to create a reasonable doubt as to the sanity of the Defendant and thus make this a jury question.

Looking at the opinion in *Armstrong,* we find, at page 627, the following language:

What testimony the State introduced in rebuttal cannot be said to bear directly upon the subject of the fatal delusion with which it had been shown the accused was afflicted.

and additionally, we find:

These witnesses do not speak of any actions or conduct of the accused in reference to the delusion under which, it had been shown, he was laboring. The facts they state are not inconsistent with the

**39**

evidence showing a disordered state of mind of the accused on the subject of (his delusion). In any view we may consider the rebuttal testimony, it cannot be said to meet the case of insanity made against the State by the testimony in the record against the accused.

*Blacks Law Dictionary,* Revised 4th Edition, defines "rebut" as "to defeat or take away the effect of something". "Rebuttal" is "the showing that statement of witnesses as to what occurred is not true". The question before this Court is whether the testimony of Dorothy Tucker and Rodney Kosares rebut the uncontroverted testimony of the defense witnesses that Gary Van Horn killed Violet Chisholm as a result of her delusions. It is not a question of whether Gary Van Horn could function outside her delusion. The defense doctors agreed she could. As to that issue, there is nothing to rebut.

This Court would never presume to state that where lay witnesses testify as to the mental condition of a Defendant, that testimony cannot create a reasonable doubt, and thus present a jury issue. The law is clear that it may. Looking back at the cases cited by the State, *McClain* has clearly distinguished itself from *Armstrong* and its findings, based upon the testimony adduced at trial. *State ex rel Bludworth* deals more with judicial authority than with actual facts. In *Byrd,* not only was there conflict with the testimony of lay witnesses, but also in what the Defendant told the doctors; additionally, there does not appear to have been any particular finding of type of mental disease to substantiate the defense position. *Collins* does not give sufficient facts, but states the correct law regarding lay vs. expert testimony. Without knowing the nature of the mental disease or the testimony, this Court cannot discuss the ruling as it relates to Ms. Van Horn's case. It should be iterated that *Collins* indicates the rebuttal testimony should be of such a nature as to permit a *reasonable inference* (emphasis added) that the Defendant was sane. *Sands* relates to a case involving conflicts between the experts as well as an issue of intoxication. Clearly the question of whether intoxication caused a state of insanity is, under these facts, a jury question. *McMahon* presents conflict in expert testimony, limited observation by some doctors, a violent personality and no mention of a mental disease.

Each of the cases cited above are distinguishable from the Van Horn case. None of these cases indicate particular mental disease, but rather seem to inferentially relate to the other possibilities under the modified version of the M'Naghten Rule: mental infirmity or defect. This is not true of Gary Van Horn; she clearly has a mental disease.

It is obviously the position of the State that by presenting the

40

testimony of Tucker and Kosares, a question has been raised which question must be resolved by the jury. However, as in *Armstrong,* supra, not every witness called by the State after the defense has rested is a "rebuttal witness". The issue of whether they are a rebuttal witness rests not on the stage of the trial at which they are called, but whether their "testimony", in fact, rebuts or raises the question of whether the testimony of the doctors may not be true. This Court must find that neither the testimony of Tucker nor of Kosares meets this test.

Uncontroverted testimony evidenced that over a period of time, Gary Van Horn was exhibiting delusion tendencies; that her condition was deteriorating immediately prior to the homicide; that the delusions still exist today. The doctors at the State Hospital diagnosed her as paranoid schizophrenic. Each and every doctor that thereafter examined her and/or her notebooks diagnosed the same mental disease: paranoid schizophrenia to such a degree it was a textbook case. She was delusional as regarded her contact with God and her spiritual affliction. She was capable of functioning outside her delusions. Nothing said by the rebuttal witnesses in any way touched upon her delusions or her actions based upon those delusions, nor was there any conflict between what was said by those witnesses and the witnesses for the defense. Could there be any way of viewing the rebuttal testimony so as to create a reasonable inference of sanity. This Court must answer in the negative.

The defense of insanity is not well looked upon by the general public. Much has been made in recent days about John Hinckley, found not guilty by reason of insanity in the case charging him with attempted murder of President Reagan. But neither the defense of insanity nor any other individual is on trial. Gary Van Horn is on trial.

This Court is more than cognizant of the law regarding lay vs. expert witnesses, burdens of proof of the respective parties and the general law relating to the insanity defense. However, this Court must look at the law and the evidence of this case, and this case alone, to determine if the rebuttal evidence was, in fact, rebuttal. If not, the case of *Fisher v. State* must control. Whether no witnesses are called to rebut the defense of insanity as in *Fisher,* or whether the witnesses called do not rebut the defense of insanity as in this case, matters not. The State, in this case, presented no evidence which touched upon the actions of the Defendant or upon the delusions under which she was acting. In fact, her spiritual affliction and the causes of it were never discussed. Additionally, on cross examination, one of the rebuttal witnesses rendered no opinion on the Defendant's sanity, and the other did not dispute the doctor's findings. Nothing they said can be viewed

**41**

as rebutting the case of insanity made by the defense nor would it prove sanity beyond a reasonable doubt. It is therefore

ORDERED AND ADJUDGED that the Defendant's Motion for Directed Judgment of Not Guilty by Reason of Insanity be and the same is hereby granted. It is further

ORDERED AND ADJUDGED that this cause is set, pursuant to Fla.R.Cr.P. 3.217, for hearing, on the 5th day of May, 1987, at 8:30 a.m.

DONE AND ORDERED this 24th day of April, 1987, in Chambers, at Clearwater, Pinellas County, Florida.